UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CARLOS AVALOS,

              Plaintiff,

    v.

STEFANIE L. BALTZELL, et al.,

            Defendants.

CASE NO. 2:19-cv-01066-RSM-BAT

**REPORT AND RECOMMENDATION**

      Defendants Stefanie L Baltzell, Carpenter, Jeneva Cotton, D. Dahne, Department of Corrections ("DOC"), R. Donahue, Ron Haynes, Amanda Kersey, Benjamin P. Porter, Schneider, Schreiber, Brian Schuetter, Eric Stielau, Vincent Stroup, and Renee Wuollet move, pursuant to Fed. R. Civ. P. 56, for summary judgment dismissal of Plaintiff Carlos Avalos' claims. Dkt. 30. Defendants served Plaintiff with their motion for summary judgment and Notice to Pro Se Inmate of Dispositive Motion on February 10, 2020. Dkts. 30, 37. The motion was noted for consideration on March 6, 2020. *Id.* Plaintiff filed no opposition to the motion.

      Based on a review of the complaint, motion and supporting materials, the undersigned recommends that the Court grant Defendants' motion for summary judgment and dismiss all claims with prejudice.

REPORT AND RECOMMENDATION - 1

<u>STATEMENT OF MATERIAL FACTS</u>

A.    <u>Plaintiff's Sworn Allegations</u>

Plaintiff contends Defendants allowed him to self-harm between September 2018 and December 2018 and punished him instead of keeping him safe. Dkt. 6 (Plaintiff's Declaration in Support of Complaint). Plaintiff alleges he has a history of mental illness and an active Individual Behavior Management Plan ("IBMP") which allowed Defendants to address his behavior. Dkt. 4. He contends Defendants abused the IBMP as follows:

1.    On September 3, 2018, Plaintiff was having suicidal tendencies and self-harmed by banging his head. Although he declared a mental health and medical emergency, the staff who witnessed his behavior did nothing to help him. Dkt. 4, ¶ 23.

2.    On September 5, 2018, Plaintiff notified the booth officer that he was having thoughts of self-harm. A nurse and Defendant Stielau watched him tie a noose around his neck but took no action. Dkt. 4, ¶ 24. After Plaintiff covered his cell window, Lieutenant Porter talked to him until he uncovered his window but failed to ask him for the noose. Plaintiff covered his window again and hung himself, but the noose snapped. *Id.* He had a film of blood in his throat and was coughing up blood but was denied all medical care. *Id.*

3.    Plaintiff filed a grievance about the failure of the nurse and Defendant Stielau to respond. Plaintiff contends Defendant Dahne did a shady investigation and is a liar because he concluded that the situation had been handled in accordance with Plaintiff's IBMP, *i.e.*, that 15-minute checks were in place, but after Lt. Porter retrieved the sheet strips (noose), the 15-minute checks were discontinued.  Dkt. 6, ¶ 25. Plaintiff appealed the grievance and claims that the ensuing investigation revealed that the noose was not recovered until September 8, 2018, essentially leaving him in his cell for three days with the noose. And, despite having this

REPORT AND RECOMMENDATION - 2

1    information, the Superintendent Haynes wrongfully concluded that all actions taken were

2    appropriate. *Id.*

3          4.      On September 5, 2018, Plaintiff told CUS Baltzell that he was having thoughts of

4    self-harming, was suicidal, and wanted to be placed in restraints but she refused to take any

5    action. Dkt. 4, ¶ 27. Also, on September 5, 2018, Defendant Kersey refused to put him in a

6    restraints chair although he attempted suicide and self-harmed on that day. *Id.*, ¶ 28. On

7    September 7, 2018, Plaintiff told Defendant Carpenter that he was suicidal, but Defendant

8    Carpenter ignored him and lied to Defendant Russell when he said that he retrieved the noose on

9    September 7, 2018 (as Defendant Haynes' investigation revealed the noose was not recovered

10   until September 8, 2018). Dkt. 4, ¶ 29.

11         5.      On September 6 and 7, 2018, Plaintiff told Defendant Schuetter that he was

12   suicidal and still had the noose, but Schuetter ignored him. Dkt. 4, ¶ 30.

13         6.      Between September 2018 and December 2018, Plaintiff met with Defendants

14   Schnieber, Cotton, Baltzell, and Kersey on three occasions to discuss his depression and mental

15   health issues that cause him to act out and self-harm. They called him a manipulator, ignored

16   him, and failed to conduct a comprehensive psychological assessment. Dkt. 4, ¶ 31.

17         7.      On September 20, 2018, Plaintiff notified the booth officer that he was bleeding

18   due to self-harm. Nurse Schneider triaged his wound and educated him about treating his wound.

19   However, after Plaintiff explained that he was going to continue to cut his wrist until he bled to

20   death, she took no action in response to his suicidal tendencies. Dkt. 4, ¶ 42.

21         8.      On October 4, 2019, Plaintiff declared a mental health emergency and told

22   Defendant Wuollet that he was suicidal. Nurse Wuollet ignored him and walked away. After he

23   self-harmed for hours, Plaintiff was infracted and found guilty of feigning illness. Dkt. 4, ¶ 41.

B.    <u>History of Staff Assault, Self-Harm, Threats</u>

Through various declarations, Defendants present Plaintiff's history of staff assaults, self-harming, and threats. To the extent Plaintiff has failed to properly address these assertions of fact, the Court considers them undisputed for purposes of this motion.

Plaintiff has assaulted DOC staff at least five times and has attempted or threatened other staff assaults. On February 3, 2014 at the Clallam Bay Corrections Center ("CBCC"), Plaintiff repeatedly stabbed an officer around the head, neck, face, and throat with a metal-edged weapon that was four to five inches long. Dkt. 32, Declaration of Yvonne Brumfield, Ex. 1 (Initial Serious Infraction Report dated April 22, 2014). The officer was on medical leave for 10 months due to the assault and Plaintiff received an additional assault conviction. *State v. Avalos*, No. 49672-1-II, 2017 WL 5452961, at *1 (Wash. Ct. App. Nov. 14, 2017).

In December 2014 at the Washington Corrections Center ("WCC"), Plaintiff stabbed two staff members while reaching through the cuff port on his cell door. Dkt. 32, Brumfield Decl., Ex. 2 (Initial Serious Infraction Report dated December 21, 2014); and Ex. 3 (Initial Serious Infraction Report dated December 31, 2014). Later, during Plaintiff's transport to and from superior court for a change of plea hearing for his latest assault of a corrections officer, he used a concealed shank to stab a corrections officer in the face. *State v. Avalos*, No. 48873-6-II, 2017 WL 6337459, at *1 (Wash. Ct. App. Dec. 12, 2017).

On July 28, 2017 at the Washington State Penitentiary ("WSP"), when Plaintiff was being moved to have an x-ray taken, Plaintiff used a concealed metal instrument to strike a corrections officer in the head, neck, and ear. Dkt. 36, Declaration of Allison Window, Ex. 1 (Initial Serious Infraction Report dated July 31, 2017.) On July 10, 2018, Plaintiff threw an object at the corrections officer who was serving him dinner and threatened to stab the officer in

the neck and head. *Id.*, Ex. 2 (Initial Serious Infraction Report dated July 10, 2018). Before these assaults in DOC custody, Plaintiff had "a total of five prior assault convictions for attacking counselors and security officers in his juvenile detention facility." *State v. Avalos*, No. 49672-1-II, 2017 WL 5452961, at *1 (Wash. Ct. App. Nov. 14, 2017).

On January 16, 2018, Plaintiff sent a kite to Corrections Unit Supervisor Stephanie Baltzell. A relevant excerpt of the kite follows:

> … Do you think [I'm] stupid? Keep it real! I believe [I'm] more intelligent than most people. I feel superior in a sense. I always outsmart you guys in the end.
>
> I want to make a deal with you. If you can talk to Thrasher and see if you can get me transferred back to [Washington State Penitentiary] IMU South or [Washington Corrections Center] ASAP I will not attempt to assault any more officers while I am here plus I will give you five pieces of metal. If not then I will bide my time for surely an opportunity will present itself in the future. You see everything I have done has been planned.
>
> Read my past assaults. I never fail! All I was doing was seeing how officers would respond and react. I was observing your security practices. I know deep down inside you must realize this. Do you want to know why I was banging my head. I made a promise to my sister I would stop stabbing people for no reason especially ones that never did anything to me.
>
> Well I intend to keep that promise. When I was [committing] self harm I was observing your officers looking for my next victim. I saw some officers smirking they found it amusing to see another human being hurting himself. People like that deserve to get stabbed. Don't you think? Not even I can laugh at shit like that. For each their own. I have my targets they choose their own path.

Dkt. 31, Declaration of Stephanie Baltzell, Ex. 1, p. 8-9.

In response to Plaintiff's behavior, several Individual Behavior Management Plans ("IBMP"s) were put in place. The IBMPs set out plans to deal with Plaintiff's frequent behaviors of declaring mental health emergencies for non-emergent issues, threatening or engaging in self-harm or suicidal behavior, and threatening to assault staff. Dkt. 33, Declaration of Dustin Hird,

REPORT AND RECOMMENDATION - 5

Ex. 8, pp. 103-105 (IBMP dated 2/02/18); Ex. 9, pp. 107-109 (IBMP dated 3/20/18); Ex. 10, pp. 111-114 (IBMP dated 7/12/18).

Plaintiff arrived at the Stafford Creek Corrections Center ("SCCC") on November 14, 2017, and was housed in the Restrictive Housing Unit, the unit where Stefanie Baltzell is the Correctional Unit Supervisor (CUS). Dkt. 31, Baltzell Decl., ¶ 3. Dr. Amanda Kersey was Plaintiff's assigned mental health provider and she completed a Mental Health Update for Plaintiff on January 2, 2018. Dr. Kersey noted, "[Plaintiff] will often call mental health emergencies when he feels he has been denied something." Dr. Kersey also noted that Plaintiff's IBMP from 2015 concluded that a lot of Plaintiff's self-harm threats were to obtain control of his environment and housing. Plaintiff reported he was always "looking" when Dr. Kersey asked about his assaultive ideation and stated, "[t]hat is just the way my brain works." In a previous Mental Health Update, Plaintiff noted, "my assaults occur when I feel like something needs to happen or things aren't going right and no one will help me. I do not want to be this way, but when I feel hopeless, it is the only thing I know how to do to make things happen." Dkt. 33, Hird Decl., Ex. 6, p. 93-97 (Mental Health Update dated 1/02/18).

Plaintiff briefly left the SCCC in May 2018 but returned on August 28, 2018. Dkt. 31, Baltzell Decl., ¶ 3. Plaintiff had several meetings with Dr. Kersey soon after his arrival. Dkt. 33, Hird Decl., Ex. 2, pp. 36-38 (Primary Encounter Reports dated 8/29/18 and 8/31/18). He began self-harming again on September 4, 2018, by banging his head on the wall. Plaintiff refused to clean the small cut on his forehead despite being provided gauze by medical. *Id.*, Hird Decl., Ex. 1, p. 3 (Primary Encounter Report dated 9/04/18).

On September 4, 2018, another IBMP was instituted for Plaintiff by a multidisciplinary team including Dr. Kersey, CUS Baltzell, Sergeant Brian Schuetter, Correctional Program

Manager Rob Schreiber, and Associate Superintendent Jeneva Cotton. Dkt. 33, Hird Decl., Ex. 12, pp. 120-122 (IBMP dated 9/04/18). The IBMP made note of the following:

> Offender Avalos has a history of staff assault and as recently as 7/10/18 threatened staff with serious bodily harm. He has stated he has nothing to lose and will attempt to assault staff when he can. At times, and recently more frequently (2-3x/week) he will call emergencies or engage in behaviors indicating he will harm himself, most recently by hitting his head on a solid object. At times he has expressed his intent to have staff come in for him at which point he has an opportunity to harm. Offender Avalos is under strict security enhancements. This IBMP is designed to help Offender Avalos address issues in a more proactive and safe way, increase appropriate, positive communication, and help him earn levels with while [sic] in the IMU.

Dkt. 33, Hird Decl., Ex. 12, p. 120. The IBMP also outlined certain action steps to take when Plaintiff engages in specific behaviors. One specific behavior is when Plaintiff declares a mental health or medical emergency for non-emergent issues. The targeted behavior is for Plaintiff to use the kite system to communicate with staff appropriately for non-emergent issues. If Plaintiff declares a mental health emergency for a non-emergent issue, staff are to notify Plaintiff that appropriate staff will be notified, cease dialogue with Plaintiff, and then notify the appropriate staff immediately. *Id.*, pp. 120-21.

Another of Plaintiff's behaviors is to threaten or engage in self-harm or suicidal behavior. The target behavior is for Plaintiff to use appropriate coping and communication skills to self-regulate his emotions and express needs. If Plaintiff threatens self-harm or suicidal behavior, staff are to let Plaintiff know that medical care will be provided as needed and encourage him to use alternative coping skills. If Plaintiff self-harms, staff are to notify the Shift Lieutenant or Shift Sergeant and Medical, who will monitor the situation and at the appropriate time, assess Plaintiff's wounds and treat if needed. The IBMP also outlines a plan for how custody staff, in consultation with Medical and/or Mental Health, will intervene if it becomes needed for

1    Plaintiff's safety, and how Mental Health will assess Plaintiff, if needed, to determine if he needs

2    to be placed on a restraint bed or restraint chair. *Id.*, Hird Decl., Ex. 12, p. 121.

3          The IBMP also addresses Plaintiff's behavior of threatening staff with harm or assaulting

4    staff. The target behavior is for Plaintiff to resolve issues with others with reasoned

5    communication, the ability to operate without harm to others, and to increase his freedom of

6    movement. Action steps for Plaintiff are to collaborate on his treatment plan, consistently

7    participate actively in mental health treatment, and to complete his homework as assigned, to

8    include practicing prosocial and cognitive behavioral skills. Dkt. 33, Hird Decl., Ex. 12, p. 121.

9    C.    Events of September 5-7, 2018

10         During the second shift on September 5, 2018, Plaintiff filed an emergency grievance

11   stating that aliens were buzzing around his head. The Grievance Department deemed it to be a

12   non-emergent grievance. Plaintiff then covered his window and stated that he was self-harming.

13   A Crisis Negotiation Team was able to successfully talk Plaintiff down, and he was moved to a

14   holding cell. Dkt. 31, Baltzell Decl., Ex. 5 (2nd Shift Passdown 9/05/18). There is no record of

15   Plaintiff communicating a threat of self-harm directly to CUS Baltzell on September 5, 2018. *Id.*,

16   Baltzell Decl., ¶ 7. Plaintiff also did not meet with Dr. Kersey on September 5, 2018. Dkt. 33,

17   Hird Decl., Ex. 2, pp. 37-38 (Mental Health Primary Encounter Reports from 8/31/18 and

18   9/06/18).

19         In the evening of September 5, 2018, when staff picked up dinner trays, Plaintiff put both

20   of his arms in the security box and took the cuff port of his door hostage. Staff gave Plaintiff

21   time to think about giving up the cuff port. Plaintiff then pushed his blanket out of the cuff port

22   and tied it to the door handle, making it so the cuff port could not be closed. Crisis Negotiation

23   Team member Sergeant Bolden was able to get Plaintiff to back away from the cuff port so it

1    could be used. Roughly two hours later, another offender was overheard coaching Plaintiff on

2    how to pit custody staff against administrative staff so that custody staff would side with him

3    over administrative staff. They made an agreement to attempt to ingratiate themselves with an

4    officer so that the officer would do things for them. Dkt. 31, Baltzell Decl., Ex. 6, pp. 24-25 (3rd

5    Shift IMU Passdown 9/05/18), and Ex. 12, pp. 42-43 (Behavior Observations dated 9/05/18).

6            At around midnight on September 6, 2018, Plaintiff reported to the IMU booth officer

7    that he was having thoughts of self-harm and wanted to speak to a nurse. The incident was

8    immediately reported to Sergeant Eric Stielau, who then immediately reported it to the Shift

9    Commander (Lieutenant Matthews) and medical. Sgt. Stielau also had an officer with a camera

10   immediately posted at Plaintiff's cell front. Sgt. Stielau and a nurse named Cogburn went to

11   Plaintiff's cell front, and Sgt. Stielau noted braided sheet strips tied to Plaintiff's vent grill. After

12   Nurse Cogburn spoke with Plaintiff for a few minutes, Sgt. Stielau directed Plaintiff to remove

13   the sheet strips. Plaintiff refused. At one point during the conversation, Plaintiff stood on his

14   toilet and loosely placed the sheets around his neck. He also stated he wanted to go to upper

15   medical. Staff were able to talk Plaintiff down from the sink but were unable to get Plaintiff to

16   remove or relinquish the sheet from his cell. Nurse Cogburn consulted with the on-duty mental

17   health provider J. Luadzers, who determined that 15-minute cell checks should be conducted.

18   Plaintiff then bit himself on the arm, although no blood was visible, and covered his front

19   window with paper. Staff were still able to clearly check on Plaintiff through the back window of

20   his cell. It was ultimately determined that a team should be prepared for cell entry, and in

21   preparation for cell entry, Lieutenant Matthews spoke to Plaintiff. After that discussion, Plaintiff

22   uncovered his window and went to sleep. The 15-minute watch continued, as it had been ordered

23   to continue, until 5:00 p.m. on September 6, 2018. Dkt. 31, Baltzell Decl., Ex. 7, p. 27 (1st Shift

REPORT AND RECOMMENDATION - 9

1  IMU Passdown 9/06/18), and Ex. 10, p. 37 (Incident Report of Eric Stielau); Dkt. 33, Hird Decl.,

2  Ex. 2, at p. 38 (Primary Encounter Report dated 9/6/18), and p. 83 (Conditions of Confinement –

3  Mental Health dated 9/06/18).

4        Plaintiff did not cause issues during the day on September 6, 2018, and Sgt. Brian

5  Schuetter noted in his passdown that staff had discontinued the 15-minute checks on Plaintiff.

6  Dkt. 31, Baltzell Decl., Ex. 8, p. 29 (2nd Shift Passdown 9/06/18). Plaintiff also did not have any

7  issues on the 3rd shift on September 6, 2018. *Id.*, Baltzell Decl., Ex. 8, p. 31 (3rd Shift Passdown

8  9/06/18). During the grievance investigation, Plaintiff admitted to CUS Baltzell that on

9  September 6, 2018, when Sgt. Schuetter asked Plaintiff for the noose, Plaintiff told Sgt.

10  Schuetter that he had flushed it. Dkt. 35, Declaration of Jordan McKinney, Ex. 3, p. 14 (Level II

11  Grievance Investigation for Grievance Log ID No. 18664086).

12        On September 7, 2018, while he was picking up dinner trays during the third shift, Sgt.

13  William Carpenter saw that Plaintiff was tearing up a sheet to make a noose, and Plaintiff again

14  threatened self-harm. Sgt. Carpenter called an officer to be posted at Plaintiff's cell with a

15  camera, and once the officer arrived, Sgt. Carpenter notified Lieutenant Porter of the situation.

16  Sgt. Carpenter then spoke with Plaintiff and eventually, Plaintiff contracted not to commit self-

17  harm and passed the noose out to Sgt. Carpenter through the cuff port. Dkt. 31, Baltzell Decl.,

18  Ex. 9, p. 34 (3rd Shift Passdown 9/07/18); Ex. 11, p. 42 (Incident Report of William Carpenter);

19  and Ex. 13, p. 45 (Behavior Observation dated 9/07/18).

20  D.      <u>Encounter with RN Schneider on September 20, 2018</u>

21        RN Karen Schneider reported to Plaintiff's cell front at 10:40 p.m. on September 20,

22  2018 to examine Plaintiff's left wrist where he had scratched an old wound bed. The scratch had

23  dried blood and no active bleeding. RN Schneider educated Plaintiff on how to keep the wound

1    clean by washing with soap and water and advised Plaintiff that if any infection occurred, he

2    should notify medical or bring it up during the nurses' daily well checks. Plaintiff told RN

3    Schneider that he'd been having a desire to commit suicide since earlier that afternoon. RN

4    Schneider noted that Plaintiff was not actively engaged in suicidal behavior or self-harm at the

5    time he made the comment. When asked about his plan, Plaintiff said he would scratch his wrist

6    until he bled to death. RN Schneider then requested that the sergeant be placed one-on-one at

7    Plaintiff's door. Dkt. 33, Hird Decl., Ex. 1, p. 10 (Primary Encounter Report dated 9/20/18); Dkt.

8    35, McKinney Decl., Ex. 2, pp. 4-9 (responses to Grievance Log ID No. 18663941).

9          RN Schneider then called Dr. Ryan Donahue, the mental health provider on call, who

10   reviewed Plaintiff's IBMP. Under Plaintiff's IBMP at the time, if he threatened or engaged in

11   self-harm or suicidal behavior, the steps to be taken were to let him know that medical care

12   would be provided if needed and to notify the Shift Lieutenant or Shift Sergeant, who would

13   monitor Plaintiff. Dkt. 33, Hird Decl., Ex. 12, pp. 120-22. Dr. Donahue determined that Plaintiff

14   was not in imminent danger and no additional action needed to be taken other than to follow the

15   IBMP, which included notifying the unit Sergeant and Lieutenant, as Plaintiff had already been

16   provided medical care for his superficial scratch. Dkt. 33, Hird Decl., Ex. 1, p. 9 (Primary

17   Encounter Report dated 9/20/18); Dkt. 35, McKinney Decl., Ex. 2, pp. 10-13 (responses

18   Grievance Log ID No. 18663941). Plaintiff also had a follow-up meeting on the morning of

19   September 21, 2018, with Dr. Kersey in which they discussed his behavior from the night before.

20   Dkt. 33, Hird Decl., Ex. 2, p. 42 (Primary Encounter Report dated 9/21/18).

21   E.    Encounter with RN2 Wuollet on October 4, 2018

22         On October 4, 2018, Plaintiff declared a medical emergency. When RN2 Renee Wuollet

23   responded, Plaintiff told her, "I'm suicidal, because these guys are fucking with me, they are

REPORT AND RECOMMENDATION - 11

1    refusing me my yard and shower time, they said I'm burnt." RN2 Wuollet discussed the situation

2    with officers, and it was noted that Plaintiff was in fact scheduled for yard and shower. Plaintiff

3    also denied any injuries, self-harm, or a plan for self-harm at that time. Based on this, RN2

4    Wuollet determined that Plaintiff's issue was non-emergent. Dkt. 33, Hird Decl., Ex. 1, p. 13

5    (Primary Encounter Report from 10/04/18). Plaintiff's IBMP stated that if Plaintiff declared a

6    medical emergency for non-emergent reasons, staff were to cease dialogue with him and notify

7    the appropriate staff immediately. RN Wuollet followed this procedure. *Id.*, Hird Decl., Ex. 12,

8    pp. 120-121; Dkt. 31, Baltzell Decl., Ex. 14, p. 7 (Behavior Observation Entry for 10/04/18).

9    F.    <u>Meetings with Staff About Conditions of Confinement and Departure</u>

10           Plaintiff had meetings related to the conditions of his confinement with some or all of the

11    following people: Correctional Program Manager Rob Schreiber, CUS Baltzell, Dr. Kersey, and

12    Associate Superintendent Jeneva Cotton. *See* Dkt. 31, Baltzell Decl., Ex. 16, p. 51-61 (Kites

13    about meetings). For example, at a meeting on September 28, 2018, Plaintiff discussed the

14    timeline of his transfer from SCCC. Dkt. 33, Hird Decl., Ex. 2, p. 3 (Primary Encounter Report

15    dated 9/28/18). Cotton, Schreiber, and Baltzell were also involved in developing Security

16    Enhancement Plans for Plaintiff which contained plans meant to keep both Plaintiff and staff

17    safe. Dkt. 31, Baltzell Decl., Ex. 17, p. 64-66 (Security Enhancement Plan from 10/09/18) and

18    Ex. 18, p. 69-71 (Security Enhancement Plan from 11/16/18). There is no indication that during

19    any of the meetings, Plaintiff shared a specific, present threat to self-harm.

20           Plaintiff made some progress with staff at SCCC. For example, Plaintiff and Lieutenant

21    Porter had a productive conversation on September 21, 2018, that led to Plaintiff uncovering his

22    window without being infracted. Dkt. 31, Baltzell Decl, Ex. 15, p. 49 (email from Benjamin

23    Porter dated 9/21/18). Plaintiff also sent kites to Dr. Kersey noting that he once stopped himself

1    from trying to pull a staff member in through his cuff port, and that he "[would] try to be more

2    mindful about declaring [mental health] emergencies." Dkt. 33, Hird Decl., Ex. 15, p. 135 (kite

3    dated 10/14/18); Ex. 16, p. 137 (kite dated 10/16/18).

4    On January 22, 2019, Plaintiff was transferred to a new facility. Dkt. 31, Baltzell Decl,, ¶

5    3. Thereafter, Plaintiff sent CUS Baltzell a letter in which he apologized for his behavior. *Id.*,

6    Baltzell Decl., Ex. 22, p. 84.

7    <u>DISCUSSION</u>

8    A.    <u>Summary Judgment Standard</u>

9    The Court shall grant summary judgment if no genuine issue of material fact exists and

10   the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In support of a

11   motion for summary judgment, the moving party need not negate the opponent's claim, *Celotex*

12   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986); rather, the moving party will be entitled to judgment

13   if the evidence is not sufficient for a jury to return a verdict in favor of the opponent, *Anderson v.*

14   *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). When the record, taken as a whole could not lead

15   a rational trier of fact to find for the non-moving party, summary judgment is warranted. *See*

16   *Beard v. Banks*, 548 U.S. 521, 529 (2006).

17   The moving party bears the burden of showing that there is no evidence which supports

18   an element essential to the non-movant's claim. *Celotex*, 477 U.S. 322. To defeat a motion for

19   summary judgment, the non-moving party must make more than conclusory allegations,

20   speculations or argumentative assertions that material facts are in dispute. *Wallis v. JR Simplot*

21   *Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

22

23

REPORT AND RECOMMENDATION - 13

B.    Defendant DOC is Not a "Person" Within Section 1983

Plaintiff names the DOC as a defendant (Dkt. 4, ¶ 16), and attempts to raise Eighth Amendment claims for deliberate indifference under 42 U.S.C. § 1983 against all defendants, including the DOC. *Id.*, ¶ 43. However, Plaintiff's § 1983 claims against Defendant DOC fail as a matter of law because the DOC is not a "person" within the meaning of § 1983. Under 42 U.S.C. § 1983, only persons may be held liable for deprivation of constitutional rights. *See* 42 U.S.C. § 1983. "[A] State is not a person within the meaning of § 1983," and this includes a state's agencies. *Will v. Michigan Dept of State Police*, 491 U.S. 58, 64 (1989) (holding the state police agency was not a person within 42 U.S.C. § 1983).

Accordingly, the undersigned recommends that Plaintiff's § 1983 claims against DOC be dismissed.[1]

C.    Claims Against Defendants Haynes, Dahne, Stroup, and Porter, and Unspecified Claims "From September to December 2018"

To obtain relief against a defendant under § 1983, a plaintiff must prove that a particular defendant has caused or personally participated in causing the deprivation of a particular protected constitutional right. *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981); *Sherman v. Yakahi*, 549 F.2d 1287, 1290 (9th Cir. 1977). To be liable for causing the deprivation of a constitutional right, the particular defendant must commit an affirmative act, or omit to perform an act that they are legally required to do, which causes plaintiff's deprivation. *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978). A plaintiff must also set forth the specific factual basis supporting his claim for each defendant's liability. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th

---

[1] Plaintiff's claim against the DOC under the Americans with Disabilities Act is discussed separately in Paragraph G below.

REPORT AND RECOMMENDATION - 14

Cir. 1980). Absent some personal involvement by the defendants in the allegedly unlawful

conduct of subordinates, they cannot be held liable under § 1983. *Johnson*, 588 F.2d at 743-44.

      1.   <u>Defendants Haynes and Dahne</u>

      Plaintiff alleges that Defendants Haynes and Dahne violated his constitutional rights

because they reviewed his grievances and signed the grievance responses despite his claims that

self-harm had occurred. Dkt. 4, at ¶¶ 25-26.

      The record reflects that Defendant Dahne signed the Level 0 or Level I response for

seven of Plaintiff's grievances. Dkt. 35, Declaration of Jordan McKinney, Ex. 1, at p. 6; Ex. 2, at

p. 8-9; Ex. 3, at p. 15-16; Ex. 4, at p. 21-22; Ex. 5, at p. 24; Ex. 6, at p. 26; Ex. 7, at p. 28.

Defendant Haynes signed the Level II response for one grievance. *Id.*, Ex. 2, at p. 10.

      Plaintiff claims that both defendants did a "shady" investigation and therefore his Eighth

Amendment rights were violated. Dkt. 4, at ¶¶ 25-26. However, offenders do not have a

constitutional right to a specific grievance procedure, and merely ruling against an offender's

grievance does not cause or contribute to any alleged underlying deprivation. *See Gallagher v.

Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009); *George v. Smith*, 507 F.3d 605, 609 (7th Cir.

2007); *Ramirez v. Galaza*, 334 F.3d 850, 860 (9th Cir. 2003) (citing *Mann v. Adams*, 855 F.2d

639, 640 (9th Cir. 1988)) (inmates lack a separate constitutional entitlement to a specific

grievance procedure).

      The record reflects that Defendants Dahne and Haynes had only limited, supervisory

involvement in the responses to Plaintiff's claims of self-harm by reviewing the grievances he

filed after certain incidents of self-harm took place. This limited involvement is not sufficient to

support a § 1983 claim. Accordingly, it is recommended that Plaintiff's claims against

Defendants Dahne and Haynes be dismissed.

1    2.    Defendant Stroup

2    Plaintiff names Sergeant Vincent Stroup as a defendant but makes no specific factual

3    allegations against him. Dkt. 4, ¶ 12.  Plaintiff has not alleged and has not demonstrated that

4    Defendant Stroup caused or personally participated in causing the deprivation of any protected

5    constitutional right. Accordingly, the undersigned recommends that Plaintiff's claims against

6    Defendant Stroup be dismissed.

7    3.    Defendant Porter

8    Plaintiff Avalos claims Lieutenant Porter (along with Sergeant Eric Stielau) saw him at

9    his cell front on September 6, 2018. Dkt. 4, at ¶ 24. According to Stephanie Baltzell, DOC

10    Correctional Unit Supervisor, however, it was Lieutenant Matthews, a non-defendant, who was

11    at Plaintiff's cell that night and not Defendant Porter. Dkt. 31, Declaration of Stephanie Baltzell,

12    Ex. 7, p. 27[2] (Email Re: F-Unit, 1st Shift Daily Report, Staffing); and Ex. 10, p. 42 (9/6/18

13    Incident Report).

14    Plaintiff raises no other specific factual allegations against Defendant Porter. *See* Dkt. 4.

15    Accordingly, he has not alleged and has not demonstrated that Defendant Porter caused or

16    personally participated in causing the deprivation of any protected constitutional right and it is

17    recommended that Plaintiff's claims against Defendant Porter be dismissed.

18    D.    General Allegations of Eighth Amendment Violation

19    Plaintiff makes a general claim that all the defendants violated his Eighth Amendment

20    rights from September 2018 through December 2018. *See*, *e.g.*, Dkt. 4, ¶ 43; Dkt. 6, ¶¶ 9-10.

21    To survive a motion for summary judgment, Plaintiff must provide more than conclusory

22    allegations to explain how each Defendant personally participated in any alleged unconstitutional

23

[2] CM/ECF numbering.

REPORT AND RECOMMENDATION - 16

conduct. *See Lujan*, 497 U.S. at 888. In the absence of specific, factual information to support his claims against Defendants for events that occurred in September through December, 2018 (outside of any specific details included in his complaint and otherwise addressed herein), it is recommended that these general claims be dismissed for failure to show personal participation.

E.    Eighth Amendment

Plaintiff claims that each individual defendant was deliberately indifferent to his serious mental health needs because in specific circumstances, each person was made aware of his risk of self-harm or threats of suicide and each person ignored the risk and took no action to protect Plaintiff from himself. Dkt. 4.

A prison official violates the Eighth Amendment when two requirements are met: (1) the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm; and (2) the prison official must have a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825 (1994). Thus, the deprivation alleged by the inmate must be, objectively, "sufficiently serious", and subjectively, the prison officials must know of and must deliberately disregard the risk of harm to the inmate. *Farmer*, 511 U.S. at 834, 842. If one of the components is not established, the court need not inquire as to the existence of the other. *Helling v. McKinney*, 509 U.S. 25, 35 (2018).

Only those conditions of confinement that deny a prisoner "the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *LeMaire v. Maass*, 12 F.3d 1444, 1456 (9th Cir.1993). An inmate's suicide or significant self-harm is sufficiently serious to satisfy the objective element of an Eighth Amendment claim. *Lemire v. CA. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013); and *see Simmons v. Navajo County, Ariz.*, 609 F.3d 1011 (9th Cir. 2010), *overruled on other*

1   *grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). Assuming for

2   purposes of this motion, that Plaintiff's claims of medical emergencies and attempts at self-harm

3   were genuine, there is nevertheless, no competent evidence to show that any of the Defendants

4   knew of or disregarded an excessive risk to Plaintiff's health or safety or were deliberately

5   indifferent to Plaintiff's serious medical needs.

6       "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051,

7   1060 (9th Cir. 2004). Inmates alleging Eighth Amendment violations based on unsafe prison

8   conditions must demonstrate that prison officials were deliberately indifferent to their health or

9   safety by subjecting them to a substantial risk of serious harm. *Farmer*, 511 U.S. at 834. In a

10  self-harm case, a plaintiff must show not only that Defendants knew he had a risk of self-harm

11  but that they knew that he had an acute risk. *Simmons*, 609 F.3d 1011 at 1018. Prison officials

12  display a deliberate indifference to an inmate's well-being when they consciously disregard an

13  excessive risk of harm to the inmate's health or safety. *Farmer*, 511 U.S. at 838-40. In other

14  words, a showing of deliberate indifference requires that the defendant knew of an excessive risk

15  to inmate health or safety and that the defendant deliberately ignored it. *Grenning v. Miller-*

16  *Stout*, 739 F.3d 1235, 1239 (9th Cir. 2014). Additionally, an inmate must demonstrate that a

17  defendant's deliberate indifference was both an actual and proximate cause of the inmate's

18  injuries. *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013).

19      There is no competent evidence before the Court reflecting that any defendant ignored

20  Plaintiff's claims that he was at risk of self-harm or suicide. Instead, the record reflects that each

21  defendant reasonably responded to Plaintiff. Further, there is no evidence that Plaintiff suffered

22  any harm caused by any alleged indifference to his needs. Rather, the record reflects that

23  Plaintiff was closely monitored by staff and as a result, did not commit serious harm to himself.

REPORT AND RECOMMENDATION - 18

1        For example, Plaintiff claims that Defendant Stielau did not protect him from self-harm

2    on September 5-6, 2018, when he allowed Plaintiff to remain in his cell with a noose and with

3    his window covered. Dkt. 4, ¶ 24. Plaintiff claims he hung himself, and that the noose caused

4    bleeding and pain in his throat. *Id.* However, these claims are not supported by the factual record,

5    including Plaintiff's medical record. Instead, the record reflects that immediately after learning

6    of Plaintiff's threats to commit self-harm in the early morning of September 6, 2018, Defendant

7    Stielau had an officer posted one-on-one at Plaintiff's cell front, spoke with Plaintiff at his cell

8    front with a nurse, convinced Plaintiff to remove the sheet strips on his vent from around his

9    neck, and continued to have Plaintiff watched on 15-minute checks through the other, uncovered

10   window of his cell. The ultimate result was that Plaintiff went to sleep and did not harm himself.

11   *See* Dkt. 31, Baltzell Decl., Ex. 7, p. 27, and Ex. 10, p. 38; Dkt. 33, Hird Decl., Ex. 3, p. 38, and

12   Ex. 4, p. 83. Such actions do not show deliberate indifference to any acute need, particularly

13   since harm to Plaintiff was avoided.

14       Plaintiff also claims that he alerted Defendants Baltzell and Kersey to his suicidal intent

15   on September 5, 2018, and both ignored his complaints. Dkt. 4, at ¶¶ 27-28. However, Defendant

16   Baltzell states in her declaration that she did a walk-through of the unit on that day at

17   approximately 3:45 p.m. and Sgt Stroup did his walk-through immediately after.  Defendant

18   Baltzell does not remember Plaintiff declaring self-harm on that date and if he had, she would

19   have notified Sgt. Stroup to get a staff member posted at Plaintiff's door to watch him until a

20   mental health provider arrived to dialogue with him. Dkt. 31, Baltzell Decl., ¶ 7. Plaintiff also

21   claims Defendant Schuetter was deliberately indifferent to his needs because he left Plaintiff

22   with a noose in his cell. Dkt. 4, ¶ 30. However, Plaintiff admitted that on September 6, 2018,

23   when Defendant Schuetter asked Plaintiff for the noose, he told Defendant Schuetter that he had

REPORT AND RECOMMENDATION - 19

1    flushed it. Dkt. 35, McKinney Decl,, Ex. 3, p. 14. As a result, Defendant Schuetter discontinued

2    the 15-minute checks on Plaintiff. Dkt. 31, Baltzell Decl,, Ex. 8, p. 29.

3            Thus, if there was a risk of serious harm, Plaintiff concealed it from Defendant Schuetter.

4    Moreover, although Plaintiff claims it was risky to leave him with a noose in his cell for any

5    period of time, Plaintiff did not harm himself with the noose. *See Lemire v*, 726 F.3d at 1074

6    (inmate must demonstrate that a defendant's deliberate indifference both actually and

7    proximately caused injury).

8            Plaintiff further alleges that Defendant Carpenter was deliberately indifferent by leaving

9    him with a noose on September 7, 2018. Dkt. 4, at 29. The record reflects that on September 7,

10   2018, Defendant Carpenter saw Plaintiff tearing up a sheet to make a noose and threatening self-

11   harm. At that time, Sgt. Carpenter called an officer to be posted at Plaintiff's cell with a camera

12   and he notified Lieutenant Porter. Sgt. Carpenter then spoke with Plaintiff, eventually convincing

13   Plaintiff to contract not to commit self-harm, and Plaintiff passed the noose out to Sgt. Carpenter

14   through the cuff port. Dkt. 31, Baltzell Decl., Ex. 9, p. 34; Ex. 11, p. 40; Ex. 13, p. 45. This

15   evidence does not show deliberate indifference; rather, it shows that Defendant Carpenter

16   responded reasonably and appropriately to Plaintiff's threats of self-harm.

17           Plaintiff claims Defendants Schneider and Donahue were deliberately indifferent when

18   they interacted with him on September 20, 2018. ECF No. 4, at ¶ 42. However, the record

19   reflects that Defendant Schneider assessed Plaintiff's superficial scratch with no active bleeding,

20   educated Plaintiff on how to keep his wound clean, and told him to notify medical if the wound

21   worsened. Dkt. 33, Hird Decl., Ex. 1, p. 10 (Primary Encounter Report dated 9/20/18); Dkt. 35,

22   McKinney Decl., Ex. 2, at pp. 6-9 (responses to Grievance Log ID No. 18663941).

23

REPORT AND RECOMMENDATION - 20

1    Thereafter, when Plaintiff told Defendant Schneider that he was having suicidal thoughts,

2    Defendant Schneider questioned Plaintiff about his plan, requested that a sergeant be placed one-

3    on-one at Plaintiff's door, and called Defendant Donahue, the mental health provider on call.

4    After reviewing Plaintiff's IBMP, Defendant Donahue determined that Plaintiff was not in

5    imminent danger and his plan should be followed. Following the IBMP involved notifying the

6    unit Sergeant and Lieutenant of Plaintiff's threats, which had already been done and ultimately,

7    Plaintiff did no further harm to himself. Dkt. 33, Hird Declaration, Ex. 1, p. 10 (Primary

8    Encounter Report dated 9/20/18); Dkt. 35, McKinney Decl., Ex. 2 at pp. 6-9 (responses to

9    Grievance Log ID No. 18663941).

10    Based on the competent summary judgment evidence provided, the undersigned

11    concludes that Defendants Schneider and Donahue were not deliberately indifferent to Plaintiff's

12    needs. Instead, they provided Plaintiff with medical care for his scratch and dealt with his threats

13    of self-harm according to his IBMP.

14    Plaintiff also contends that DOC staff failed to conduct suicide assessments in accordance

15    with the Suicide Risk Assessment Protocol. *See*, *e.g.*, Dkt. 4, ¶ 31. The Suicide Risk Assessment

16    Protocol directs staff to complete a Suicide Intervention Inventory if an offender claims to be

17    suicidal. However, this protocol is not to be used if there is a "Safety Plan or Treatment Plan in

18    place that addresses the concern and directs another course of action." Dkt. 34, Declaration of

19    Jennifer Lobe; Ex. 2, p. 9 ("Suicide Risk Assessment Protocol"). The record reflects that Plaintiff

20    had such a plan in the form of his IBMP. Accordingly, Plaintiff's claims that any of the

21    defendants violated policy by not completing a suicide intervention inventory are not supported

22    by the record.

23

REPORT AND RECOMMENDATION - 21

1    Plaintiff also claims that over a three-month period he met with Defendants Schreiber,

2   Cotton, Baltzell, and Kersey and during those meetings, they ignored his claims of self-harm or

3   suicidal thoughts. Dkt. 4, at ¶ 31. Defendants confirm that Defendants Schreiber, Cotton,

4   Baltzell, and Kersey had meetings with Plaintiff, but the meetings were to discuss Plaintiff's

5   conditions of confinement and to develop Security Enhancement Plans to keep Plaintiff safe. *See*

6   Dkt. 31, Baltzell Decl., Exs. 16, 17, and 18.

7    In sum, Plaintiff has failed to provide competent and persuasive evidence to support his

8   claim that any of the Defendants were deliberately indifferent to an acute risk of harm to him.

9   The Court need not adopt Plaintiff's version of the facts for purposes of this motion as his

10   version of the facts is contradicted by the record. *See Scott v. Harris*, 550 U.S. 372, 380, 127 S.

11   Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). Where "the factual context renders [the nonmoving

12   party's] claim implausible . . . , [that party] must come forward with more persuasive evidence to

13   support [its] claim than would otherwise be necessary" to show that there is a genuine issue for

14   trial). *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

15   Here, Plaintiff has failed to come forward with more persuasive evidence to show that there is a

16   genuine issue for trial.

17    Prison staff are not liable when they respond reasonably to an inmate's threat of self-

18   harm. *See*, *e.g.*, *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006) (noting that prison staff are

19   not required to take perfect or even reasonable action but instead the inmate must show staff

20   recklessly or intentionally disregarded a known risk of suicide). Here, the undisputed record

21   reflects that staff appropriately intervened when Plaintiff claimed he was going to self-harm or

22   claimed to be suicidal and that no serious harm occurred. Thus, the undersigned recommends

23   that Plaintiff's Eighth Amendment claims be dismissed.

REPORT AND RECOMMENDATION - 22

F.    <u>Qualified Immunity</u>

As another alternative basis for dismissal, Defendants contend they are entitled to qualified immunity from damages. "[Q]ualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

Because Plaintiff has failed to show the existence of a genuine issue of material fact as to any constitutional violation, the Court need not address the alternative immunity argument.

G.    <u>Americans with Disabilities Act Claims</u>

Plaintiff raises a claim against the DOC under the Americans with Disabilities Act ("ADA"). Dkt. 4, ¶¶ 32-40. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II applies to state prisons. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *see also Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir. 2001). A "disability" under the ADA includes a "mental or psychological disorder such as [...] emotional or mental illness." 28 C.F.R. § 35.108(b)(1)(ii).

To state a Title II ADA claim, a plaintiff must allege, in part, that "he was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities *. . . by reason of [his] disability*." *Simmons*, 609 F.3d at 1021 (emphasis added) (quoting *McGary v. City of Portland*, 386 F.3d 1259, 1265 (9th Cir. 2004 (alteration in original)).

Plaintiff has not alleged that he has a disability that substantially limits one or more major life activities or that he was denied any DOC service, program, or activity because of his

1    disability. He claims only that the DOC violated the ADA by denying him adequate mental

2    health treatment. Dkt. 4, ¶¶ 36-39. This is not sufficient to state a claim under the ADA as the

3    ADA "prohibits discrimination because of disability, not inadequate treatment for disability."

4    *Simmons*, 609 F.3d at 1022; *see also O'Guinn v. Nevada Dep't of Corr.*, 468 F. App'x 651, 653

5    (9th Cir. 2012) ("[Plaintiff] challenges the adequacy of his . . . health care, a challenge that

6    cannot be properly brought under the ADA and RA.").

7        Because Plaintiff is asserting only that he was not provided appropriate treatment for his

8    mental health and has not otherwise asserted or supported a disability claim, the undersigned

9    recommends that Plaintiff's ADA claims be dismissed.

10                            OBJECTIONS AND APPEAL

11        This Report and Recommendation is not an appealable order. Therefore, a notice of

12    appeal seeking review in the Court of Appeals for the Ninth Circuit should not be filed until the

13    assigned District Judge enters a judgment in the case.

14        Objections, however, may be filed and served upon all parties no later than **May 6, 2020.**

15    The Clerk should note the matter for **May 8, 2020**, as ready for the District Judge's consideration

16    if no objection is filed. If objections are filed, any response is due within 14 days after being

17    served with the objections. A party filing an objection must note the matter for the Court's

18    consideration 14 days from the date the objection is filed and served. The matter will then be

19    ready for the Court's consideration on the date the response is due. Objections and responses

20    shall not exceed seven (7) pages. The failure to timely object may affect the right to appeal.

21        DATED this 16th day of April, 2020.

22

23

                                    BRIAN A. TSUCHIDA
                                    Chief United States Magistrate Judge

REPORT AND RECOMMENDATION - 24